UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| TOMA GODWIN AYIGBA | : | DOCKET NO. 2:06-cv-2247<br>Section P |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| J. P.  YOUNG, ET AL. | : | MAGISTRATE JUDGE WILSON |

## REPORT AND RECOMMENDATION

Currently before the court is a petition for writ of *habeas corpus* filed by petitioner, Toma Godwin Ayigba, pursuant to 28 U.S.C. § 2241. This matter was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B).

Petitioner is under a final removal order, and he has been in post-removal-order detention since May 14, 2006.  In his petition, he challenges his post-removal-order detention as being indefinite and unconstitutional.  He claims that there is no significant likelihood of his being removed to Nigeria or South Africa in the reasonably foreseeable future.

Based upon the evidence in the record, the undersigned determined that an evidentiary hearing was necessary for the adjudication of this *habeas corpus* petition.  An evidentiary hearing was held on April 24, 2007, and the evidence was limited to whether there is a significant likelihood of removing Petitioner in the reasonably foreseeable future, whether the petitioner has been detained beyond what is reasonably necessary to secure his removal, and/or whether petitioner has taken steps to hamper the removal efforts of the United States Immigration & Customs Enforcement. [doc. 12].

**FACTUAL SUMMARY**

The court will summarize the facts regarding petitioner and his detention as best it can from the evidence in the record and the testimony presented at the evidentiary hearing.

On August 27, 2003, petitioner was indicted in the United States District Court for the District of Nevada of knowingly and willingly making a false statement in a passport application in violation of 18 U.S.C. § 1542. Specifically, it was alleged that on May 7, 2002, petitioner stated on a passport application that his name was Mario Brooks and that he was born in Chicago, Illinois on December 10, 1973 to Louis Brooks and Louise Green. *See United States v. John Doe, aka Mario Brooks*, 2:03-cr-00378 (D. Nev.), doc. 1. On January 10, 2005, following a jury trial, petitioner was found guilty as charged. *Id.*, doc. 46. On March 28, 2005, petitioner was sentenced to 16 months for this offense. *Id.*, doc. 52. Petitioner appealed this decision to the Ninth Circuit Court of Appeals, and on January 19, 2006, the appellate court affirmed petitioner's conviction. *See* Government Exhibit 13; *United States v. Doe (Mario Brooks),* 05-10218 (9th Cir. 2006).

An immigration detainer was lodged against petitioner. *See* Government Exhibits 3-6. A Notice to Appear was issued to petitioner on December 14, 2005, charging him with being subject to removal under INA § 212(a)(6)(A)(I) as an alien present in the United States without being admitted or paroled and under § 212(a)(2)(A)(i)(I) as an alien convicted of acts involving moral turpitude. *See* Government Exhibit 7. This latter charge of removal was based upon a May 9, 2001 conviction in a Florida state court for the criminal use of personal identification information, uttering a forged check, and grand theft. *Id.* On December 23, 2005, petitioner was released from criminal custody and taken into immigration custody this same date. *See* Government Exhibit 11. Petitioner was detained in custody pursuant to the authority of INA § 236. *See* Government Exhibit 12.

Following the decision of the 9th Circuit, an Additional Charge of Inadmissibility/Deportability was served on petitioner on January 30, 2006, charging petitioner with being removable under § 212(a)(6)(C)(i) as an alien who by fraud or willful misrepresentation seeks to procure a visa, other documentation or admission into the United States and under § 212(a)(7)(A)(i)(I) as an alien not in possession of a valid entry document.  *See* Government Exhibit 14.

During an initial interview on December 20, 2005, petitioner refused to provide fingerprints, pictures, and background information. *See* Government Exhibit 8.  Further, the record completed by the immigration official indicates that petitioner denied that his name was Tamo Ayigba. *Id.*

On April 14, 2006, an immigration judge in Oakdale, Louisiana found petitioner to be removable as charged and ordered him removed from the United States to South Africa or in the alternative to Nigeria. *See* Government Exhibit 16.  Petitioner reserved the right to appeal, however, he did not file an appeal with the Board of Immigration Appeals (BIA).  Thus, his removal order became final on May 14, 2006.

On April 18, 2006, petitioner provided a sworn statement wherein he stated that his true name is Moses Tamobota; that he has used other names; that he believes he is a citizen of South Africa; and that his date of birth is February 14, 1974. *See* Government Exhibit 18.

On May 25, 2006, immigration officials sent a Request for Acceptance of Alien to the Embassy of South Africa. *See* Government Exhibit 19.  They also sent a letter to the Consulate General of Nigeria requesting a travel document for petitioner. *See* Government Exhibit 20.  On June 28, 2006, a request was sent to DHS/ICE Headquarters for Detention and Removal, seeking assistance in obtaining a travel document for petitioner. *See* Government Exhibit 21.  A second request was sent to the Embassy of South Africa on August 24, 2006. *See* Government Exhibit 22.

In a post order custody review conducted in July, 2006, immigration officials found that petitioner was hampering his removal by refusing to cooperate with removal efforts and determined that he should remain in custody. *See* Government Exhibit 24. It was noted that petitioner had refused to provide information such as the names of schools he attended, his last foreign address, or the names of relatives residing abroad. *Id.*, p.4. Petitioner has been served with a Form I-229, Warning for Failure to Depart on several occasions. *See* Government Exhibits 25-31.

Petitioner testified that he has spoken to the Nigerian Consulate approximately six times. Immigration records and the testimony of petitioner's deportation officer, Brian Firmin, indicate that during petitioner's telephonic interview with the Nigerian Consulate he has told them he is from South Africa. Because of petitioner's statement to the Nigerian Consulate, Nigeria declined to issue a travel document. *See* Government Exhibit 35, p.2. Additionally, because South Africa could not verify that petitioner is one of its citizens, South Africa returned the travel document request on September 5, 2006 with a notation that a travel document should be requested from Nigeria. *See* Government Exhibit 35, p.1.

In response to the Notices of Failure to Comply, petitioner wrote a letter to his deportation officer dated November 15, 2006. *See* Government Exhibit 34. In this letter, petitioner states that he has complied with all of the rules and regulations with which he was obligated to comply. Nevertheless, he argues that the British Consulate, the Nigerian Consulate, and the South African Consulate have declined to issue a travel document for him and that he should be released from immigration custody. *See* Government Exhibit 34. He filed this petition on November 27, 2006, seeking his release from custody.

Petitioner's present deportation officer testified that efforts to obtain a travel document for

4

petitioner from Nigeria are continuing. He indicated that in his experience Nigeria is a "problem country" where delays are often encountered in the repatriation process even though Nigeria will generally issue travel documents for its citizens. With respect to petitioner's case, he testified that he spoke with the Nigerian Embassy on March 21, 2007. It is his understanding that Nigeria will issue a travel document for petitioner once they receive sufficient proof of his nationality.

Petitioner testified that he was born in South Africa on February 14, 1974 and that he lived in Nigeria for a period of time before returning to South Africa and then entering the United States at the age of 15 with his older sister (age 22) by using a false British passport. At the hearing petitioner testified that he is willing to go to either Nigeria or South Africa but that his memories of South Africa are not pleasant. Petitioner provided no specific information regarding his memories of South Africa. He failed to identify the name of his school, claiming only that he went to school in the "homeland" which he claims is in the northern part of South Africa. Further, he did not provide the names of anyone who might be able to assist in identifying him. He claimed that his parents are deceased and that they died in South Africa in 1994.[1] Petitioner also stated that the sister with whom he entered the United States still resides here, however, he stated that he has not maintained contact with her, and he did not provide any information concerning her.

The court also notes that according to documents admitted into evidence, petitioner was purportedly born in Lagos, Nigeria on December 10, 1979 and entered the United States at an unknown time and date, without inspection. *See* Government Exhibit 1. Petitioner testified that his birth name is Moses Tamobata. However, according to other documents in the record, petitioner has

---

[1] However, a document prepared in May, 2006 for submission with a travel document request identified his parents as Tamobato Ayigba and Anna Ayigba and listed their addresses as "unknown." This document did not indicate that his parents were deceased. *See* Government Exhibit 21.

5

used the following aliases: Mario Brooks, Delvon Michael Freeman, Antoine Scott, Mosess Tamobato, and John Doe. *Id.* He has also used several birth dates including: 9/29/1977, 02/01/1979, and 12/10/1979. *See* Government Exhibit 24. It is further noted that in petitioner's pre-sentence report dated 2/9/2005, petitioner stated that his true name is Tamo Godwin Ayigba and that he is a citizen of Nigeria.

Petitioner has not provided any contact information about relatives or other persons living in either Nigeria or South Africa who might know him and be able to identify him. However, according to the criminal complaint filed when petitioner was arrested in December 2002 a receipt was found indicating that petitioner had wired money to someone in Nigeria named "Ayigba." When petitioner was questioned about this, he admitted wiring money to someone in Nigeria but denied that the person was related to him. He stated that the money was wired for the purpose of obtaining visa documents so that he could remain in the United States and that he used his own last name because the person picking up the wired money would not be required to provide any personal identification and would only need to give the bank petitioner's name as proof that they were entitled to pick up the money. His testimony was that "nobody else can know that name in Nigeria."

In light of the testimony and the other evidence in the record, the government argues that petitioner's removal has not yet occurred because petitioner has failed to provide adequate information to immigration officials to obtain a travel document from either Nigeria or South Africa. The government pointed out at the hearing that petitioner has used numerous aliases during his presence in the United States and that he has not provided important information to assist in the verification of his identity such as the names and addresses of his relatives, names of schools that he attended, names and addresses of his relatives. The government contends that the delay in petitioner

6

removal is a consequence of his refusal to cooperate with them and provide adequate information as to his identity which will enable them to acquire a travel document from either Nigeria or South Africa.

The petitioner counters this argument by claiming that he has cooperated with efforts to remove him since his criminal conviction became final in April 2006.

## LAW AND ANALYSIS

The issue before the court is whether petitioner's prolonged post-removal-order detention is lawful. The government argues that petitioner's detention is lawful and that petitioner's removal has been delayed because of his court proceedings.

Following an order of removal, the Attorney General is given 90 days to effect the removal of the alien. INA § 241(a)(1). This 90-day period of time is referred to as the removal period. During this removal period, the alien is subject to detention. INA § 241(a)(2). If the alien is not removed during the removal period, the alien is generally released to supervision. INA § 241(a)(3).

Detention can be extended beyond the 90 day removal period in limited circumstances. INA § 241(a)(6) authorizes the continued detention of certain inadmissible or criminal aliens, such as petitioner, if the Attorney General determines that the alien is a risk to the community or unlikely to comply with the order of removal. Because the Supreme Court concluded that indefinite detention of aliens under the circumstances set forth in § 241(a)(6) would raise serious constitutional concerns, it construed the statute to contain an implicit "reasonable time" limitation. *Zadvydas v. Davis*, 121 S.Ct. 2491, 2495 (2001). The Supreme Court held that in order to be constitutional, detention pursuant to INA §241(a)(6) must be limited to a period of the time reasonably necessary to bring about the alien's removal. *Zadvydas,* 121 S.Ct. at 2498. The Supreme Court went on to recognize six months as a presumptively reasonable period of detention following a final order of removal. *Zadvydas*, 121 S.Ct.

7

at 2504.

> After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut this showing. And for the detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

*Zadvydas,* 121 S.Ct. 2505.

Additionally, an alien may be detained beyond the 90 day removal period pursuant to the statutory authority of INA § 241(a)(1)(C).[2] This statute provides for the suspension of the removal period whenever an alien acts in a manner to prevent his removal. This statute, like § 241(a)(6), does not contain an express limitation on the length of time that an alien may be detained. However, as the Ninth Circuit has observed, INA § 241(a)(1)(C) does not present the same constitutional concerns raised by INA § 241(a)(6) because "the risk of indefinite detention that motivated the Supreme Court's statutory interpretation in *Zadvydas* does not exist when an alien is the cause of his own detention." *Pelich v. Immigration and Naturalization Service*, 329 F.3d 1057, 1060 (9th Cir. 2003). Thus, an alien cannot assert a viable constitutional challenge to his indefinite detention when such detention is due to own actions. *Id.* at 1061.

In *Andrade v. Gonzales,* 459 F.3d 538 (5th cir. 2006), the Fifth Circuit reiterated that the Supreme Court's holding in *Zadvydas* "creates no specific limits on detention"; that "'an alien may be held in confinement until it has been determined that there is no significant likelihood of removal

---

[2]**(C) Suspension of period**
   The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8

in the reasonably foreseeable future.'"; and that "[t]he alien bears the initial burden of proof in showing that no such likelihood of removal exists." *Andrade*, 459 F.3d at 543, quoting *Zadvydas*, 121 S.Ct. at 2505. In that case, Andrade "offered nothing beyond his conclusory statements suggesting that he [would] not be immediately removed to Cape Verde following the resolution of his appeals," and the Fifth Circuit found his constitutional challenge to his detention to be without merit. *Andrade,* 459 F.3d at 543-544.

In this case, the facts before the court establish that petitioner has been in post-removal-order detention since May 14, 2006, a period greater than six months  However, there is significant evidence in the record that, unlike the detainees in *Zadvydas*, petitioner is responsible for his own plight by providing inconsistent and incomplete information which has hampered the removal process.

Petitioner has created confusion by alternatively claiming to be from Nigeria and South Africa. He has not offered to identify and provide contact information for any relatives living in the United States or abroad who may be able to assist with identification evidence for petitioner. Although he wired money to someone named "Ayigba" in Nigeria, he denies that this person was a relative and claims that he only used his own name because no one in Nigeria would know that name. However, it appears that Ayigba is a town in Kogi State, Nigeria. Additionally, petitioner's testimony reveals that petitioner has a sister who resides in the United States. She allegedly entered the United States with petitioner and could likely provide useful information regarding petitioner's origins and contacts in Nigeria and/or South Africa. However, there is no evidence before the court to suggest that petitioner has provided her name to immigration officials or sought to contact her for assistance. Moreover, petitioner claims that his memories of South Africa are "unpleasant" but he fails to provide specific information about his life in South Africa which might help to identify him

9

as a South African native. It seems incredible that petitioner cannot remember the name of his school, the town in which it was located or similar information. Although he claims that the names have changed, it is likely that even providing the former name to South African officials would enable them to locate the school petitioner attended or town where petitioner lived.

Additionally, Petitioner's skilled use of aliases has created confusion for immigration officials. Even during petitioner's criminal and immigration proceedings, he continued to provide inconsistent statement regarding his identity. He has admittedly used several aliases in the past in order to achieve the ends that he sought, e.g. he used the alias of Michael Freeman in order to work in this country.

The undersigned finds that the inconsistencies discussed above are sufficient for this court to conclude that petitioner has not been candid and truthful in dealing with the immigration officials. By failing to provide complete and accurate information, the court finds that petitioner has hampered the ICE in carrying out his removal, in apparent hopes of gaining his release from detention. This seems to be especially true in light of petitioner's awareness that following the *Zadvydas* decision, a delay in obtaining a travel document sometimes translates into release for the alien. Accordingly, the court finds that the removal period has been tolled under the statutory provision of INA § 241(a)(1)(C) and under the case law. *See Pelich, supra; Powell v. Ashcroft,* 194 F.Supp.2d at 209 (E.D.N.Y. 2002); *see also Balogun v. INS*, 9 F.3d 347, 351 (5th Cir. 1993); *Dor v. District Director, Immigration and Naturalization Service*, 891 F.2d 997, 1002-03 (2nd Cir. 1989).

Moreover, even if the court were to apply the *Zadvydas* analysis to this case, the result would be the same. Petitioner's cooperation with the removal process is relevant to the inquiry of whether

there is a significant likelihood of removal in the reasonably foreseeable future. 8 CFR § 241.13(f)[3]; 8 CFR § 241.13(d)(2). *Powell,* 194 F.Supp.2d at 212; *Ablahad v. Ashcroft*, 2002 WL 31027952, *3 (N.D. Ill. 2002).

Assuming that petitioner has satisfied his initial burden to show that there is good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future by virtue of the length of his post-removal-order detention and the indication by the Nigerian and South African officials that a travel document would not be issued without further proof of petitioner's identity, this court finds that the government has produced sufficient evidence to rebut the petitioner's claim that there is no significant likelihood of removal in the reasonably foreseeable future. Mr. Firmin testified that Nigeria generally repatriates its nationals once sufficient proof of identity is provided. Thus, this court finds that once petitioner provides accurate and complete information to the immigration officials, it is likely that he can and will be removed to Nigeria or South Africa.

For the reasons discussed above, this court finds that petitioner has hampered the efforts to remove him from the United States and that such actions on his part have tolled the removal period pursuant to INA § 241(a)(1)(C). Moreover, the court finds that it is likely that petitioner can and will be removed once he provides accurate and complete information to the INS.

Accordingly,

IT IS RECOMMENDED that the petition for writ of *habeas corpus* be DENIED and DISMISSED.

---

[3] 8CFR § 241.13(f) states as follows:
*Factors for consideration*. The HQPDU shall consider all the facts of the case including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove the alien to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question, and the receiving country's willingness to accept the alien into its territory.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, July 12, 2007.

_____
ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE